# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

AMIN BOOKER,

                                        Plaintiff,

        vs.                                                 9:12-CV-246
                                                            (NAM/ATB)

J. MALY, et al.,

                                        Defendants.

AMIN BOOKER, Plaintiff pro se
DOUGLAS J. GOGLIA, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In his amended civil rights complaint plaintiff alleges that his due process rights were denied in conjunction with a misbehavior report and disciplinary hearing, after which he was sentenced to a term in the Special Housing Unit ("SHU"). (Amended Complaint "AC") (Dkt. No. 73). Plaintiff also alleges that while he was in SHU, he was housed under conditions which violated his constitutional rights to be free from cruel and unusual punishment, his right to privacy, and his right to practice his religion. Plaintiff seeks declaratory and injunctive relief in addition to a substantial amount of compensatory and punitive damages. (AC at 51-53, ¶¶ A-C).[1]

---

[1] The court will cite to the pages of the amended complaint as were assigned by the court's electronic filing system (CM/ECF) in addition to the paragraph number or letter assigned by plaintiff, if one exists.

Several motions are presently pending before this court. Prior to filing his amended complaint, plaintiff filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 69). In his amended complaint, plaintiff has included a motion for class certification. (*See* Dkt. No. 73, ¶¶ 1-41). After plaintiff filed his amended complaint, the defendants responded in opposition to plaintiff's motion for summary judgment and made a cross-motion for summary judgment. (Dkt. No. 103). Plaintiff responded in opposition to the defendants' cross-motion. (Dkt. No. 106). Plaintiff also moved for "sanctions" because he was not satisfied with defendants' response to his summary judgment motion. (Dkt. No. 107). Defendants have responded in opposition to plaintiff's motion for sanctions. (Dkt. No. 108). Plaintiff has filed a reply to the defendants' "sanctions" response, and plaintiff has also moved for appointment of counsel.[2] (Dkt. Nos. 109, 110).

For the following reasons, this court agrees with the defendants and will recommend denying plaintiff's motions for class certification and summary judgment and will recommend granting defendants cross-motion for summary judgment. The court will order the denial of plaintiff's motion for sanctions and his motion for appointment of counsel.

---

[2] The court notes plaintiff originally moved for appointment of counsel and class certification, together with his original complaint. (Dkt. No. 1). Defendants argue that Judge Mordue has already denied the motion for class certification, and that only the plaintiff's individual claims have been allowed to proceed. (Def.s' Mem. of Law at 5) (Dkt. No. 103-4). However, on May 22, 2012, the court denied plaintiff's motions for appointment of counsel and for class certification *without prejudice*. (Dkt. No. 7 at 4-7). Thus, the court will address both of these motions.

## I.    Complaint

The court will briefly review the facts as stated in the amended complaint[3] and as outlined in Judge Mordue's May 22, 2012 Order as a basis for further discussion of the additional evidence presented by the defendants.

Plaintiff alleges that on March 24, 2010, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow"), he was approved for a "satisfactory behavior preference transfer" to Shawangunk Correctional Facility. ("Shawangunk"). (AC ¶¶ 42-43). Plaintiff states that prior to his transfer our of Great Meadow on March 26, 2010, his "draft bags" were searched by Great Meadow staff and approved for transfer with him. (AC ¶ 42). Plaintiff claims that a corrections officer viewed all of plaintiff's photos for "security clearance," and determined that none of plaintiff's property was contraband. (*Id.*)

Notwithstanding this alleged approval, upon plaintiff's arrival at Shawangunk, his property was searched outside of his presence by defendant Kavanaugh in violation of Department of Corrections and Community Supervision ("DOCCS") policy. (AC ¶ 45). Although defendant Kavanaugh was not "trained or certified" by DOCCS in identifying gang insignia, he selected five (5) of plaintiff's personal photographs, and he concluded that they contained "Blood Gang hand signs," in violation of an "unpublished departmental rule # 105.13 Gangs." (*Id.*) Based upon these photographs, on March 27, 2010, defendant Kavanaugh issued plaintiff a

---

[3] The amended complaint did not change plaintiff's claims or his recitation of the facts. Plaintiff amended his complaint to name Corrections Officers Lance Taylor and Daniel Dumas, two individuals who he originally named as "John Does." (AC at ¶¶ 155-61).

misbehavior report for violating the "unconstitutionally vague prison gang rule." (AC ¶¶ 22, 45-48).[4]

Plaintiff claims that, in furtherance of a conspiracy to violate plaintiff's civil rights, defendant Smith[5] assigned defendant Maly[6] as the hearing officer for plaintiff's disciplinary hearing. (AC ¶ 51). Plaintiff claims that he possessed all of the photographs in question for many years, and the pictures had been viewed by countless officers, during searches at various facilities. (AC ¶¶ 88-93) (description of the photographs). Plaintiff claims that some of the pictures were taken inside DOCCS facilities as part of the "inmate photo program," which is conducted and monitored by corrections officers, and thus the pictures should not have been found to be "gang" materials. (AC ¶ 88). Plaintiff alleges that defendant Maly denied plaintiff due process at the hearing by denying him witnesses, being biased, and finding plaintiff guilty on insufficient evidence. (AC ¶¶ 52-87).

Plaintiff alleges that defendant Kober, a Counselor at Shawangunk and a witness, called by hearing officer Maly, testified that the people in the photographs were making "gang signs." Plaintiff claims that, after the hearing, defendant Kober admitted to plaintiff that he lied at the hearing and "confirm[ed the] conspiracy." (AC ¶¶ 94-100). Kober allegedly implied to plaintiff that he lied because there was a

---

[4] The court notes that plaintiff has omitted a paragraph # 46.

[5] Defendant Joseph Smith was the Superintendent of Shawangunk at the time of the incidents in question.

[6] Defendant J. Maly was the Deputy Superintendent of Security at Shawangunk.

"recession," and officers were getting laid off, so the "higher ups" needed SHU cells filled. He told plaintiff not to worry because he could try to get his disciplinary sentence reduced for good behavior. (AC ¶¶ 95, 97). Plaintiff claims that while he was housed in the SHU at Shawangunk, he witnessed three other African-American inmates "get falsely charged with this same prison gang rule." (AC ¶ 100). Although plaintiff wrote to Superintendent Smith complaining of the denial of due process and of defendant Kober's "confession," plaintiff's administrative appeals were denied at both the facility and the Commissioner's level. (AC ¶ 101-103).

On April 23, 2010, plaintiff was transferred to Upstate Correctional Facility ("Upstate") to serve his SHU sentence. The amended complaint states that plaintiff was taken to Downstate Correctional Facility prior to his transfer to Upstate. (AC ¶ 105). Plaintiff complains that the bus ride from Downstate to Upstate was unreasonably slow and that the inmates' meals were unsatisfactory. (AC ¶ 106). He complaints about the guards stopping at too many rest areas. Although plaintiff does not make any claims regarding the trip itself, it appears that this transportation issue is part of plaintiff's claim that defendants are conspiring to find inmates guilty of misbehavior to keep the SHU facilities open, and the guards are getting overtime pay for the transportation. (AC ¶39). The longer it takes to bring the inmates to the SHU facility, the more money spent in overtime.

As part of the class action argument, plaintiff also alleges that the defendants are trying to keep their Aggression Replacement Therapy ("ART") program funded by increasing the number of inmates who are assigned to the program. The increase in

inmate participants is allegedly accomplished by falsely charging inmates with misbehavior that is associated with violence, such as gang activity and then forcing those inmates to participate in ART at the risk of having "a negative effect on his conditional release date, his good time credits, his family reunion participation, and other department privileges and work options." (AC ¶¶ 33-35). Plaintiff adds defendant Cook to the list of defendants who are responsible for forcing inmates to participate in ART. (AC Twelfth Cause of Action ¶ 1(a), (2)(f)).

While at Upstate, plaintiff alleges that he was subjected to "atypical and significant" as well as cruel and unusual conditions of confinement. Plaintiff claims that he was forced to share a small cell with another inmate, and that his right to privacy was denied while showering, using the toilet, and dressing. (AC ¶¶ 120-24). Plaintiff also alleges that the lights were left on continuously, making it very difficult for him to sleep (AC ¶¶ 114-19); the showers were dirty and he was given insufficient cleaning materials (AC ¶¶ 125-30); he was denied proper winter garments (AC ¶¶ 131-36); he was handcuffed when outside of his cell; was only allowed one visit per week in unsatisfactory conditions; had to request his "necessities;" had no contact with other human beings outside of his cell mate; was served extremely small portions of food; was deprived of 97% of his personal property; and was denied the opportunity to work. (AC ¶ 137(a)-(f)). Plaintiff outlined various other restrictions to which he was subjected in SHU. (AC ¶¶ 138(a)-(f)).

Plaintiff states that while he was confined in SHU, his First Amendment right to practice his religion was violated. Plaintiff is Muslim, and he was not allowed to

attend any congregate religious services (for which there is no substitute), he was not allowed to perform fithra (hair removal); he was not afforded access to an Imam; and was "daily" subjected to viewing another individual's nudity, as well as others viewing his nudity, in direct violation of the tenets of Islam. (AC ¶¶ 139-47). Plaintiff claims that defendants Rock and Fischer condoned and controlled a policy which forced plaintiff to share a cell with another individual without providing a partition to shield the inmates from "indecent exposure." (AC ¶ 148).

Plaintiff claims that defendants Maly, Smith, Kavanaugh, Kober, Fischer,[7] Prack,[8] Rock,[9] and Cook[10] entered into a civil conspiracy to violate plaintiff's (and other inmates') First, Fourth, Eighth, and Fourteenth Amendment rights. Plaintiff claims that these defendants have conspired to charge African-American and Latino-American inmates with gang activity under an unconstitutionally vague rule, find them guilty,[11] and sentence them to serve time in SHU and requiring their participation in

---

[7] Defendant Brian Fischer is the Commissioner of DOCCS.

[8] Defendant Albert Prack is the Director of Special Housing, who is, among other things, responsible for deciding appeals from facility disciplinary determinations.

[9] Defendant Rock was the Superintendent of Upstate. He retired on October 30, 2013. (Rock Decl. ¶ 1) (Dkt. No. 103-19).

[10] Defendant Cook is a Corrections Counselor at Upstate, who put plaintiff on a list for the ART program, notwithstanding that plaintiff told her that he already completed the program and did not need to take it again. (AC ¶¶ 108-112).

[11] Plaintiff states that the defendants are "in agreement" to have staff members who are not "certified or trained in gang identification" write misbehavior reports, falsely accusing African-American and Latino inmates, based on their innocuous cultural expressions, use of slang or ebonics, poetry, writing, skipping holes in lacing their shoes, and wearing their hair in particular braids. (AC ¶ 23).

the federally funded Aggression Replacement Training program ("ART").

Plaintiff alleges that defendants have intentionally failed to publish the rule in the DOCCS rule book, "although they received the funding to print the rule inside the rule book . . . ." (AC ¶ 24). Plaintiff claims that the defendants have conspired to withhold adequate notice of the prohibited conduct so that they may continue to write false misbehavior reports. (AC ¶ 25). Plaintiff alleges that the hearings are conducted in isolated locations so that inmates may be intimidated into pleading guilty. (AC ¶ 29). Plaintiff alleges that there are no criteria used to distinguish between gang materials and non-gang materials. (AC ¶ 27).

Plaintiff states that as a result of this conspiracy, (1) DOCCS receives additional money from the government because the defendants have inflated the number of inmates who "need" the ART program; (2) the need for SHU facilities has been manipulated by increasing the capacity/occupancy of SHU cells unnecessarily through the "prison gang rule scam," and (3) more overtime, and consequently more money, is generated for DOCCS staff who must transport the inmates to SHU facilities. (AC ¶¶ 22-41).

Plaintiff has again asked for class action status. (AC ¶¶ 1-7). In this request, plaintiff alleges that he wishes to bring this action "on behalf of himself and other identified and unidentified inmates incarcerated in the New York State [DOCCS]." (AC ¶ 1). Plaintiff alleges that his claims are typical of the "class," and that he will fairly represent the members of the class because he is a "direct victim," but he also asks the court to appoint a class counsel. (AC ¶¶ 3-6).

8

Plaintiff alleges that for years, plaintiff and other inmates have complained about the lack of procedural safeguards at disciplinary hearings wherein violations of the "vague" prison gang rule are charged. (AC ¶ 7). Plaintiff alleges that the rule unfairly characterizes their "cultural expressions" as amounting to "gang activity." (*Id.*) Plaintiff alleges that the injunctive relief that he has requested will affect all the class members, and therefore, class certification should be granted.

The amended complaint contains twelve causes of action. As Judge Mordue found, construed liberally, in addition to the civil conspiracy noted above by defendants Maly, Smith, Kavanaugh Kober, Fischer, Prack, Rock, and Cook (Twelfth Cause of Action), plaintiff also alleges that (1) defendants Maly, Smith, Prack, and Fischer denied plaintiff due process in violation of the Fourteenth Amendment (First and Second Causes of Action); (2) defendants Maly, Smith, Prack, Fischer, and Rock subjected plaintiff to cruel and unusual conditions of confinement in violation of his rights under the Eighth Amendment (Third, Fourth, Fifth and Sixth Causes of Action); (3) defendant Rock caused a violation of plaintiff's right to privacy in violation of the Fourth Amendment (Seventh Cause of Action); and (4) defendants Maly, Smith, Prack, Fischer, Rock, Rokace, Taylor and Dumas interfered with plaintiff's ability to freely practice his religion in violation of his First Amendment rights and his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Eighth, Ninth, Tenth, and Eleventh Causes of Action).

## II.    Class Action

Plaintiff has simply repeated the paragraphs of his original complaint that

request the court to grant class actions status under Fed. R. Civ. P. 23. (*Compare* Compl. ¶¶ 1-7, 18-41 *with* AC ¶¶ 1-7, 18-41).  Judge Mordue has already denied plaintiff's motion for class certification based upon the same facts.  Although Judge Mordue denied plaintiff's motion "without prejudice," plaintiff has cited nothing that would change Judge Mordue's analysis.  Thus, to the extent that plaintiff is again requesting class certification, this court recommends that it be denied, and will proceed based upon plaintiff's individual claims.[12]

## III.  <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential*

---

[12] The court does note that if plaintiff were to succeed individually on his claim that the challenged rule was unconstitutionally vague, to the extent that plaintiff seeks injunctive relief, the ruling would affect all inmates, including those that plaintiff alleges form his "class."  *See Forts v. Ward*, 621 F.2d 1210, 1217-18 (2d Cir. 1980) (in certain circumstances when order benefits all members of the alleged class, class certification would be a mere formality); *Galvan v. Levine*, 490 F.2d 1255, 161 (2d Cir. 1973) (certification of class unnecessary when prospective relief would benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment); *Daniels v. City of New York*, 198 F.R.D. 409, 421-21 (S.D.N.Y. 2001) (citing cases).  Thus, class certification is unnecessary to obtain the prospective relief that plaintiff seeks.

*Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## IV.  Due Process (First and Second Causes of Action)

### A.  Legal Standards

#### 1.  Procedural Due Process

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to

11

freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

## 2. Notice/Vagueness

"Due process requires prison officials to provide inmates with adequate notice of what conduct is prohibited." *Collins v. Goord*, 581 F. Supp. 2d 563, 578 (S.D.N.Y. 2008) (citing, *inter alia*, *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir.1999). "'Courts have recognized prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct. The underlying rationale . . . [is that] inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice . . . .'" *Williams v. Fischer*, 08-CV-413 (TJM/DRH), 2010 WL 3910129, at *10 (N.D.N.Y. Aug. 17, 2010) (quoting *Leitzsey v. Coombe*, 998 F. Supp. 282, 289 (W.D.N.Y. 1998)). A disciplinary rule "is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation and encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule." *Id.* (citing *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995)).

## B. Application

### 1. Liberty Interest

In this case, plaintiff was found guilty of the possession of gang-related material, but was found not guilty of possessing another inmate's legal work. (Goglia Decl. Ex. B at 4). He was sentenced to one year in SHU for the possession of gang-related photographs. Even though plaintiff only served 264 days of his one year sentence in SHU, defendants do not contest, and this court will assume for purposes of

this recommendation, that plaintiff had a protected liberty interest. Thus, the court need not engage in a lengthy analysis of whether plaintiff suffered an atypical and significant hardship,[13] and instead, may proceed to an analysis of whether plaintiff was afforded the requisite procedural safeguards.

## 2. Advance Notice of Charges

Plaintiff was served with his misbehavior report on March 27, 2010. (Kober Aff. Ex. B at 1) (Hearing Transcript ("HT")) (Dkt. No. 103-15); (Goglia Decl. Ex. B at 4, 5) (indicating delivery date and time). His hearing commenced on April 1, 2010. (*Id.*) The misbehavior report specified the rules that plaintiff was alleged to have violated. (Goglia Decl. Ex. A). The explanation in the misbehavior report was quite clear that Officer Kavanaugh had been assigned to search plaintiff's personal property, and that during the course of that search, found the five photographs that were said to be "gang-related material," in violation of Rule 105.13. (*Id.*) Officer Kavanaugh also stated that he found legal material belonging to another inmate in violation of Rule 113.27. (*Id.*) Thus, plaintiff had "advance notice of the charges" as required for ***procedural due process***.

## 3. Witnesses/Documentary Evidence

Plaintiff was given a choice of employee assistants for the hearing, and he chose Sergeant Checcia, who met with plaintiff on March 27, 2010. (HT at 1); (Goglia Decl.

---

[13] The court notes that plaintiff spends a great deal of time arguing that the restrictions imposed on him in SHU were "atypical and significant." He seems to confuse this standard for finding a liberty interest with the standard for cruel and unusual punishment which is different and which the court will discuss below.

Ex. B at 5) (Dkt. No. 103-9).  Sergeant Checcia determined that plaintiff wished to call Inmate Perez as a witness, and during the hearing, defendant Maly confirmed plaintiff's request. (*Id.* at 1-2).  Inmate Perez, the law library clerk at Great Meadow, was called to testify telephonically on plaintiff's behalf relative to the unauthorized possession of another inmate's legal work. (*Id.* at 12-16).  Inmate Perez was the only witness who plaintiff requested prior to the hearing.[14] (Goglia Decl. Ex. B at 5) (Hearing Record Sheet).

Plaintiff spent a great deal of time at the hearing, arguing that he never received the memorandum amending Rule 105.13, that the rule was not in the rule book, and that there were no specific criteria to establish whether an inmate's property contained "gang-related" material or depicted gang signs.  Plaintiff was given the opportunity to argue that he did not receive the memorandum. (HT at 24-28).  When plaintiff told defendant Maly that he had not received the memorandum updating Rule 105.13, defendant Maly adjourned the hearing in order to obtain evidence regarding the plaintiff's receipt of this document. (HT at 8-10).  When defendant Maly recommenced the hearing, plaintiff was provided with copies of pages of the "Locator System," a two page copy of the memorandum updating Rule 105.15 that was issued in 2008; and a copy of the redacted Green Haven Log Book for A-Block on May 17,

---

[14] Defendant Maly called Inmate Perez as a witness for plaintiff.  Perez testified that he was an inmate law clerk and made a mistake in sending plaintiff another inmate's papers. (Kober Aff. Ex. B at 15-16) (Dkt. No. 103-15).  As a result of Inmate Perez's testimony, plaintiff was found not guilty of possession of another inmate's legal work. (Id. at 33).

2008,[15] the time when the memorandum was distributed to all inmates. (*Id.*)

However, when plaintiff requested to call the individual who actually "gave" him the memorandum 2008, the hearing officer denied that "unknown" witness. The hearing officer explained the reason for the denial. (HT at 28-30). There was no indication that anyone in particular gave plaintiff the amended rule. (HT at 29). The document produced by defendant Maly stated that the amendments were "passed out at twenty-two hundred." (*Id.*) Defendant Maly assumed that the floor officers were responsible for passing out the rules. (*Id.*) Thus, defendant Maly's denial of plaintiff's unknown witness, who gave plaintiff the amendment to Rule 105.13 two years prior to the hearing in this case was reasonable, given the documentary evidence supporting the finding that plaintiff received the memorandum when it was distributed to all inmates on the unit. The denial was not a violation of plaintiff's right to present witnesses.

What plaintiff does not state in his complaint, or anywhere in his papers, is that he was well aware of the rule and the 2008 memorandum because he brought a lawsuit, making identical claims in 2010, after a prior misbehavior report, charging him with similar behavior. *Booker v. Tokarz*, No. 10-CV-4796, 2012 WL 5431008 (E.D.N.Y. Nov. 7, 2012). Defendants have filed a copy of plaintiff's amended complaint in *Tokarz* as Exhibit D to the Goglia Declaration. In *Tokarz*, plaintiff even made similar claims about the conditions in SHU. (*Id.*)

---

[15] Plaintiff was housed in A-Block at Green Haven at the time that the Rule 105.13 amendment was distributed.

In *Tokarz*, the plaintiff was charged with the possession of photographs that were considered gang-related material. The hearing officer produced the same documentary evidence as defendant Maly, showing that plaintiff was given the rule amendment in May of 2008. In *Tokarz*, plaintiff made the same argument that he never personally signed for the rule amendment, and he was given a copy of the memorandum by the hearing officer. (*See Tokarz*, No. 10-CV-4796, Dkt. No. 54-12, Def.s' Ex. I, Pt. 1 at 11-12, 23-24).[16] Clearly, plaintiff is, and was, well-aware of the rule amendment. Even if plaintiff had not received a copy when the rule was distributed to all inmates in 2008, he received a copy of the rule during his disciplinary hearing in *Tokarz*. Plaintiff's argument in this case that he did not receive the memorandum regarding the rule amendment is disingenuous at best.[17]

Plaintiff's request to call the officer who packed his property at Great Meadow was also denied. (HT at 31-32). Defendant Maly denied that witness because plaintiff did not dispute his ownership of the photographs. (HT at 32). Plaintiff did not deny that he owned the photographs, he was trying to show that the unknown officer who

---

[16] This court has examined the documents filed in *Tokarz*. However, the review of those documents was not necessary to determine that plaintiff knew about the rule since he brought the same claim as he brings in this case, and defendants have filed plaintiff's own amended complaint in *Tokarz* as an exhibit in this case. The review of the disciplinary hearing transcript in *Tokarz* merely confirms that plaintiff received the memorandum at that hearing.

[17] The court notes that even if it were not so obvious that plaintiff received a copy of the rule at the hearing in *Tokarz*, the evidence that he was housed in A-Block, and the log book entry, indicating that "all" inmates on A-Block received copies of the memorandum, would have been sufficient evidence *at a prison disciplinary hearing* to show that he received the memorandum. Defendant Maly's denial of unknown witnesses from a different facility, whose conduct occurred two years prior to the disciplinary hearing was quite reasonable and justified as lacking necessity. *See Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (hearing officer may refuse to call a witness due to lack of necessity or irrelevance).

packed the photographs did not find that they were gang related. The fact that an officer packed plaintiff's property without noticing or finding that the photographs were gang-related material would not change the fact that defendant Kober found them to be so. Thus, the denial of the "unknown" witness who packed plaintiff's belongings at Great Meadow was not a violation of plaintiff's right to present evidence.

Finally, defendant Maly refused to call defendant Kavanaugh, the author of the misbehavior report to explain why he determined the photos to be gang-related. The court finds that the refusal to call defendant Kavanaugh was reasonable, given that defendant Kober was called to testify about the photographs. The misbehavior report is only a charge that plaintiff has violated a facility rule, and defendant Kavanaugh simply wrote the misbehavior report. The determination of whether plaintiff was guilty of that misbehavior is based upon the evidence presented at the hearing.

### 4.    Sufficiency of Evidence

Defendant Maly called Corrections Counselor Kober to testify about gang-related material. (HT at 17-23). Plaintiff alleges that the evidence was insufficient to find him guilty of the misbehavior because Kober was not qualified to testify about gang signs and was not specific about his reasoning at the hearing. Plaintiff also claims that defendant Maly and defendant Kober "discussed" what Kober was going to say, also showing that defendant Maly was biased.

As stated above, the quantum of evidence required for a guilty finding in a prison disciplinary hearing is "some," "reliable" evidence, nowhere near the amount of

evidence required for conviction in a criminal case. *Sira v. Morton, supra.* First, in this case, there is absolutely no basis for plaintiff's conclusory statement that defendant Maly prejudged plaintiff's guilt or conspired to have defendant Kober give false testimony at the hearing, even if Maly did ask defendant Kober to testify.[18] Defendant Kober has submitted an affidavit explaining his testimony and why additional specificity is contrary to security concerns. (Kober Aff.) (Dkt. No. 103-13).

In his affidavit, defendant Kober states that his job as Corrections Counselor includes reviewing the records of "each inmate [who] is transferred into Shawangunk . . . ." (Kober Aff. ¶ 4). Defendant Kober states that he reviewed plaintiff's records prior to meeting him when he was transferred to Shawangunk and noticed that plaintiff had identified himself to corrections officials as a member of the "Bloods." Defendant Kober also noticed that plaintiff was previously charged in misbehavior reports involving gangs or gang-related materials. (*Id.* ¶ 5). Defendant Kober has included plaintiff's disciplinary record as Exhibit A to his affidavit. (Dkt. No. 103-14). The disciplinary record shows that plaintiff has been charged with, and found guilty of, various misbehavior related to gangs and possession of gang-related material. In addition to the misbehavior adjudicated in this case, he was found guilty of behavior dealing with "unauthorized organizations" on June 6, 2002 (Kober Ex. A at 2); on July 26, 2000 (*Id.* at 3); on November 15, 1999. (*Id.* at 4); and on July 7, 1999 (*Id.* at 5).

In addition to defendant Kober's job as a Corrections Counselor, he has been

---

[18] Defendant Kober states that he was called as a witness by defendant Maly and was asked at the hearing to look at the five photographs to determine whether they contained gang-related material. (Kober Aff. ¶¶ 14, 18).

designated to receive training relative to gangs and their activities in the correctional system. (Kober Aff. ¶¶ 6-7). This designation involved initial training as well as continuing education of four hours per month. (*Id.* ¶ 7). However, there are no textbooks for this training, and it is not a course of study that leads to a "certification" as a "gang expert."[19] Instead, defendant Kober states that the training involves dissemination and discussion of intelligence material about gangs which is obtained from a number of different confidential sources. (*Id.* ¶ 8).

One of the important parts of defendant Kober's training is to learn the means by which gangs identify themselves because a significant number of inmates come into the correctional system with gang affiliations and retain these affiliations while incarcerated. (*Id.* ¶ 9). These methods of identification serve to enable gang members to identify each other for protection as well as warning to members of rival gangs. (*Id.* ¶ 10). Gang presence and activity within the correctional system presents "a real potential for danger because of their ability to bring about and coordinate organized violence at any time." (*Id.* ¶ 11). The correctional staff must be able to identify the gangs and their members in order to prevent any problems. (*Id.* ¶ 12). Defendant Kober states that it is also important for security to keep confidential the information that he receives as well as the sources from which that information is received in order for the staff to be effective in preventing the problems that can arise because of the gangs. (*Id.* ¶ 13). Once the inmates who belong to the gangs are aware that the staff

---

[19] At his disciplinary hearing, plaintiff was attempting to determine whether Kober had a "certification." (Kober Aff. Ex. B, Hearing Transcript ("HT") at 22-23).

knows their means of identification, they develop new ways to identify themselves. (*Id.*) This is why defendant Kober does not go into much detail when he is called to serve as a witness at an inmate's disciplinary hearing. (*Id.* ¶ 13).

Defendant Kober explains his rationale for determining that the photographs in question depicted gang signs. (Kober Aff. ¶¶ 19-22). Defendant Kober explains that the hand signs in at least four of the five photographs are associated with the Bloods. (*Id.*) Defendant Kober also states that, although he was not asked at the hearing, the Bloods also use the color red as a "common identifying sign," and that in addition to the hand signs, both inmates in one of the photographs are dressed in red from head to toe. (*Id.* ¶ 22). Defendant Kober's testimony was sufficient to constitute "some" evidence at the disciplinary hearing, supporting the hearing officer's determination of guilt.

### 5. Hearing Officer Bias

Plaintiff argues that defendant Maly was not impartial. "An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F. 3d at 253, 259 (2d Cir. 1996). An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess the evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 569–70 (2d Cir. 1990); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100

F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437-38 (W.D.N.Y. 2010).

Plaintiff believes defendant Maly was "biased" because he did not allow plaintiff to "test" the reliability of the evidence showing that plaintiff received the memorandum regarding rule 105.13. As stated above, plaintiff's entire challenge regarding his "knowledge" of the rule is specious because he brought a law suit in 2010, making the same claim about not getting the memorandum. Defendant Maly's refusal to call witnesses to "test" the evidence was reasonable and did not show that he was biased against plaintiff.

There is nothing in the record to which plaintiff refers that would show bias by defendant Maly sufficient to rise to the level of a constitutional violation. Plaintiff believes defendant Maly was biased because he did not allow plaintiff to call defendant Kavanaugh to testify and instead called defendant Kober to testify about the gang signs depicted in the photographs and appears to claim that Maly and Kober "discussed" the case prior to his testimony. There is absolutely no evidence that any discussion that occurred between Maly and Kober was more than a request that Kober review the photographs for gang-related material and testify to his opinion at the hearing. This does not indicate that defendant Maly "pre-judged" the evidence. The fact that Maly called a "trained" officer to testify shows that he was wanted to make

sure of the facts, not that he prejudged them.

Plaintiff was given a written copy of the disposition and the reasons for the guilty finding. (*Id.* at 6). At the hearing, defendant Maly read, to the plaintiff, the statement of the evidence upon which he relied. (HT at 33). Plaintiff's appeal rights were explained to him, and he was given an appeal form. (HT at 34). Thus, plaintiff's procedural due process rights were not violated in his disciplinary hearing.

### 5.    Vagueness

The question remains whether Rule 105.13 itself is vague. The memorandum circulated by DOCCS in 2008 was an amendment to the "Standards of Inmate Behavior." The amendment was meant to clarify the existing rules with respect to gang related materials. (Goglia Decl. Ex. B at 25; Copy of Amendment Memorandum) (Dkt. No. 103-9). The memorandum contained amendments to both Rules 105.13 and 105.14. The amendment to Rule 105.13 read as follows:

> 105.13 – An inmate shall not engage in or encourage others
> to engage in gang activities or display, wear, possess,
> distribute or use gang insignia or materials, including, but
> not limited to, printed or handwritten gang or gang-related
> material. I, II, III
>
> Note: For purposes of this rule, a gang is a group of
>           individuals, having a common identifying name, sign,
>           symbol or colors, who have individually or
>           collectively engaged in a pattern of lawlessness (e.g.,
>           violence, property destruction, threats of harm,
>           intimidation, extortion or drug smuggling) in one or
>           more correctional facilities or that are generally
>           recognized as having engaged in a pattern of
>           lawlessness in the community as a whole. For
>           purposes of this rule, printed or handwritten gang or

23

> gang related material is written material that, if
> observed in the inmate's possession, could result in an
> inference being drawn about the inmate's gang
> affiliation, but excludes published material that the
> inmate has obtained through the facility library or that
> has been approved for the inmate to possess through
> the media review process.

(*Id.*) Contrary to plaintiff's allegation, the amendment has been published in the Rule

Book. *See* 7 N.Y.C.R.R. § 270.2, Rule 105.13 (2012). A review of the amendment

shows that the prohibited conduct is clear to a person of average intelligence.

Plaintiff challenges the rule because he claims that it does not set forth specific

criteria for determining whether a gesture is a gang sign or whether it is simply

"cultural expression." This court disagrees. It is quite clear, according to the rule,

that a gang sign is something that another inmate would recognize as creating an

inference of a particular gang affiliation. More specificity in the prison context would

be impossible because, as stated by defendant Kober, individuals could change the

signs to avoid detection, interfering with the security and order of the facility.

In *Klimas v. Lantz*,[20] the inmate challenged a similar Connecticut rule on both

First Amendment and Substantive Due Process grounds. Prior to his incarceration,

Klimas was a Sergeant-at-Arms of the Hell's Angels Motorcycle Club ("HAMC").[21]

---

[20] *Klimas v. Lantz*, No. 3:08-CV-694, 2012 WL 3611018 (D. Conn. Aug. 21, 2012), *aff'd*, 531 F. App'x 6 (2d Cir. 2013).

[21] The court would point out that this plaintiff makes much of the fact that the gang rules target African American and Latino inmates; however, HAMC members were required to be Caucasian. 2012 WL 3611018 at *1. Thus, gang-related material can apply to any unauthorized organization, and there is no indication in the New York rule cited above that it would target any particular race. It is plaintiff who assumes that gangs are either African American or Latino.

2012 WL 3611018, at *1. The Connecticut Department of Corrections had a "zero tolerance" policy toward gangs and gang-related materials, and viewed the HAMC connection and alignment with "white supremacy groups" as a threat to the safety and security of the inmates and staff. *Id.* at *2. The Directive at issue in *Klimas* provided for the rejection of correspondence that included "letters written in code" or information that would create a clear and present danger of violence and physical harm, or threats to safety and security. *Id.*

Another directive defined a "Security Risk Group" as a group of inmates designated by the Commissioner as possessing common characteristics, which serve to distinguish them from other inmates and "which as a discrete entity, jeopardizes the safety of the public, staff, or other inmate(s) and/or the security and order of the facility." *Id.* The rule contained also defined a "Disruptive Group," with general factors for the determination of each type of group. HAMC was designated as a Disruptive Group. *Id.*

The Connecticut Department of Corrections rejected Klimas's correspondence because the materials contained references to HAMC; HAMC-related symbols; and words which contained coded meanings. *Id.* at *3. Klimas was informed that any of his correspondence that contained HAMC logos or insignia would continue to be rejected based upon security concerns. *Id.*

The court in *Klimas v. Lantz* held that "the challenged practice is reasonably related to legitimate penological interests and is not an exaggerated response to prison concerns." *Id.* at *6. With respect to a vagueness challenge, the court held that the

vagueness doctrine does not require perfect precision in the drafting of laws. *Id.* at *7 (citing *Rose v. Locke*, 423 U.S. 48, 49 (1972). The degree of vagueness that is tolerated depends upon the nature of the enactment, and in reviewing challenged regulations, the court should look to the words of the regulation, the interpretation given to analogous regulations, and the interpretation of the statute given by those who are charged with enforcing it. *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). The court held that although the Connecticut Directive implicated an inmate's First Amendment rights, it "gave reasonable notice of the proscribed speech by enumerating the specific circumstances where correspondence would be disapproved." *Id.* The court also stated that the fact that plaintiff may have received or sent correspondence in the past bearing the HAMC indicia "does not undermine the legitimacy of the defendants' rationale for rejecting his mail." *Id.* at *5 n.4.

The reasoning of *Klimas v. Lantz* supports the defendants' position that the disciplinary rule in this case is not unconstitutionally vague. Rule 105.13 gives inmates the definition of gangs and of gang-related materials. As stated above, more specificity is not required, and would be very difficult, given the number of gangs[22] and the different methods of symbolic communication that exist. The fact that plaintiff may have been able to possess those pictures at other facilities does not undermine the

---

[22] Exhibit E to defendant Kober's affidavit is an extract from an FBI document, entitled: "2011 National Gang Threat Assessment – Emerging Trends." (Kober Aff. Ex. E) (Dkt. No. 103-18). This document discusses the development of the "National Gang Intelligence Center" ("NGIC"), lists definitions of different types of gangs, and lists the names of many of the gangs that currently exist, including the Bloods, together with the trend in their criminal behavior. (*Id.* at 3-4). In New York State alone, there are **29** different gangs listed. (*Id.* at 4).

defendants' desire to regulate gang-related material at their facility. *Klimas v. Lantz*, at *5 n.4.

The court would also point out that plaintiff is not as naive as he implies. Contrary to his allegations, he has had other issues with gang-related items, including photographs. The court notes that in the 2010 case, he made some of the same challenges to the disciplinary hearing as he makes in this case. The disciplinary hearing was reversed, but the court stated that the reversal was for "'failure to maintain evidence for review.'" *Booker v. Tokarz*, 2012 WL 5431008 at *2. Plaintiff has identified himself to DOCCS officials as a member of the Bloods, holding the rank of Enforcer. (*See* Dechick Aff. ¶¶ 8-9 & Ex. A) (plaintiff's records show that his gang membership and rank were "self-reported"). Thus, plaintiff is well aware that gangs may communicate through signs and symbols. Even if such communication could also be considered "cultural expression," it is the type of "cultural expression" that may be reasonably regulated. *See Turner v. Safely*, 482 U.S. 78, 84 (1987) (a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests); *O'Lone v. Estate of Shabazz*, 482 U.S.342 (1987) (same).

In his response to defendants' motion for summary judgment, plaintiff has attached a photograph of Haile Selassie I, purportedly making the same hand sign that was found to be a gang sign in plaintiff's disciplinary hearing. (Dkt. No. 106-3 at CM/ECF p.8). Under the photograph is an explanation that the sign is the "Sign of the Holy Trinity," and the "triangle pointing downwards is an esoteric symbol

representing the material phase of the Seal of Solomon . . . ." (*Id.*)

Plaintiff has also attached a memorandum, dated February 26, 2001 from Lucien J. Leclaire, Jr., Deputy Commissioner. (*Id.* at 9). The memorandum is addressed to Father James C. Hayes, Chief of Chaplains and is in response to a memorandum sent by Father Hayes. The memorandum states that Deputy Commissioner Leclaire met with Don Selsky, who was then the Director of Special Housing and Inmate Discipline, and with Dale Artus, who was then the Director of the Crisis Intervention Unit. (*Id.*) These individuals met to discuss that it was "inappropriate for an inmate to be disciplined for *possession of a picture of this nature.*" (*Id.*) Deputy Commissioner Leclaire also stated that "Rule 105.12 of the Standards of Inmate Behavior, in no way, addresses hand signals," and that "[a]ny misbehavior report dealing solely with the displaying of hand signals [was] being dismissed by Mr. Selsky's office." The memorandum also states that "the issuance of this type of misbehavior report appears to be at a minimum." (*Id.*)

Plaintiff points out that the hand signal in his photographs was the same as that in the Haile Selassie photo. However, the court would note that the misbehavior report to which the memorandum refers was issued for "a picture of this nature,"–a picture of a well-known individual, published in what appears to be a book, where it is specifically stated that the hand symbol has historical or religious meaning. The court also notes that the disciplinary rule cited in Deputy Commissioner Leclaire's memorandum is not the rule that plaintiff was charged with violating, and the amendment to the Standards of Behavior was issued in 2008, seven years after the

Leclaire memorandum. The Haile Selassie photo is, in no significant way, comparable to the pictures possessed by the plaintiff in this case.

In fact, the photo in plaintiff's exhibit would probably be acceptable under the 2008 amendment because the amendment excludes "published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process." Rule 105.13. In addition, the fact that a gang may have adopted a symbol that is also a religious or historical symbol as a method of identification does not make that symbol any less gang-related. The regulation is not unconstitutionally vague. Thus, plaintiff's due process claims, both procedural and substantive may be dismissed as against defendants Kavanaugh, Maly, Kober, Smith, Prack, and Fischer.[23]

## V.   SHU Conditions (Third, Fourth, Fifth, and Sixth Causes of Action)

### A.   Legal Standards

The constitutional prohibition against cruel and unusual punishment includes

---

[23] In his first "cause of action," plaintiff names defendant Maly as responsible for the procedural due process violations, and in plaintiff's second cause of action, he states that defendants "Smith, Prack, and Fischer" "condoned and ratified" defendant Maly's violations by refusing to overturn the disciplinary findings. The court notes that in the body of his amended complaint, plaintiff has also named defendants Kavanaugh and Kober as being responsible for the due process violations. Other than writing the misbehavior report, defendant Kavanaugh is not alleged to have participated in the disciplinary hearing. Plaintiff alleges only that defendant Kavanaugh was not qualified to make the gang-related determination and that defendant Maly refused to call him as a witness. Plaintiff claims that defendant Kober "withheld" evidence because he withheld the criteria that he used for determining whether plaintiff's photographs were gang-related materials, making the evidence "insufficient" to find plaintiff guilty. The court has discussed defendant Kober's involvement above. Because plaintiff's procedural and substantive due process claims may be dismissed, they may be dismissed as against all defendants that plaintiff associated with the due process violations.

the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Prison officials "must 'take reasonable measures to guarantee the safety of inmates.'" *Farmer v. Brennan*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A defendant must have known of a substantial risk to inmate safety that he or she could have easily prevented but did not. *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir. 2004).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835.

The subjective prong of the deliberate indifference test is satisfied when an

official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Carlson v. Parry*, No. 06-CV-6621, 2012 U.S. Dist. LEXIS 44292, at *20–21, 2012 WL 1067866 (W.D.N.Y. Mar. 29, 2012) (collecting cases). "A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendant[] sufficient to satisfy the subjective component of the deliberate-indifference standard. *Id.* (citing *Farmer*, 511 U.S. at 842; *Proffitt v. Ridgeway*, 279 F.3d 503, 506 (7th Cir. 2002); *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997)). Common sense is relevant to deciding the obviousness of the risk. *See Hall v. Bennett*, 379 F.3d at 465 (citing *Fruit v. Norris*, 905 F.2d 1147, 1150–51 (8th Cir. 1990)).

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

## B.    Application

### 1.    General Conditions in SHU

The court would first point out that plaintiff's Third Cause of Action names only defendant Maly as "responsible" for the unconstitutional conditions of confinement because he found plaintiff guilty and sentenced him to SHU. (AC at CM/ECF p.45). Plaintiff's Fourth Cause of Action names defendants Smith and Prack as being responsible for the unconstitutional conditions in SHU because they affirmed defendant Maly's disciplinary finding. However, plaintiff made the same claim about the hearing officer in *Tokarz*, and the court held that at most, the hearing officer intended that plaintiff be confined in SHU. There was no intention or awareness that plaintiff would be exposed to unconstitutional conditions while in SHU. Thus, the Eighth Amendment claims were dismissed as against the individuals responsible for the disciplinary determination. 2012 WL 5431008, at *7.

This court agrees. Restrictive SHU conditions on their own do not per se rise to the level of cruel and unusual punishment. *Inesti v. Hogan*, No. 11 Civ. 2596, at *24 (S.D.N.Y. Mar. 5, 2013) (normal conditions of SHU confinement are not violations of the Eighth Amendment); *Dixon v. Goord*, 224 F. Supp. 2d 739, 752 (S.D.N.Y. 2002). In addition, defendants are not responsible for conditions in SHU because of any alleged improprieties in the disciplinary hearing that caused the sentence to be imposed. *Id.* Thus, to the extent that plaintiff blames defendants Maly, Smith, Prack,

and Fischer[24] for the SHU conditions only to the extent that they were involved in the disciplinary hearing at or its review,[25] any Eighth Amendment claim regarding the subsequent SHU conditions may be dismissed because there is no allegation that any of the three defendants were personally involved in maintaining the conditions in SHU or expected plaintiff to be subjected to anything more than the "normal" conditions in SHU. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (personal involvement in the violation required to establish liability under section 1983); *Green v. Bauvi*, 792 F. Supp. 928, 941-942 (S.D.N.Y. 1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

Plaintiff's sixth cause of action states that defendant Rock, the former Superintendent of Upstate is also responsible for the unconstitutional conditions of the SHU at Upstate. Plaintiff claims that the cells and the showers were dirty and the cleaning supplies were unsatisfactory. He states that he was forced to inhale "sour

---

[24] Defendant Fischer, the Commissioner of DOCCS, is named in the Fifth Cause of Action as responsible for the conditions in SHU in relation to his handling of plaintiff's disciplinary appeal. Plaintiff claims that defendant Fischer violated the Eighth Amendment by continuing the authorization of "cruel and unusual punishment after learning of the due process violations and conditions of confinement under atypical and significant hardship." (AC at 46). Plaintiff also complained that Fischer delegated his decision making to defendant Prack, who was the Director of Special Housing. Passing the decision making on to a subordinate does not rise to the level of personal involvement required to establish liability under section 1983. *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009).

[25] In addition, defendants Maly and Smith work at Shawangunk. They would certainly not be responsible for any unconstitutional SHU conditions at Upstate.

odors." (AC ¶¶ 125-29). Plaintiff claims that his cell was "uninsulated," and he was denied thermal clothing, boots, a scarf, and gloves for the winter. (AC ¶ 131). Plaintiff also alleges that he was tormented by the illumination in his cell during the night, resulting in burning, watery eyes and fatigue due to lack of proper sleep. (AC ¶ 114-19). Plaintiff alleges that he was assigned to a double cell, and that there were no curtains to shield inmates from each other while they performed their daily hygiene such as showering or using the toilet. (AC ¶¶ 120-24).

Plaintiff also claims that he was frisked when leaving his cell and that restraints were always applied, even when he had a medical appointment. (AC ¶ 137). He lost doctor-patient confidentiality because there were always guards present, he had to be locked in his cell 24-hours per day, seven days per week, with only one hour of daily recreation in a small caged area with no exercise equipment and no sunlight. He was only allowed to receive one visit per week behind a waist-high partition, with no ability to hug, kiss, or embrace his visitors. Plaintiff claims that his wife left him because of the "SHU hardship [and] lengthy sentence." (AC ¶ 137(a)). Plaintiff claims that he had to wake up at odd hours to mail his letters and to request necessities from officers who were making rounds. (AC ¶ 137(b)). Plaintiff claims that he had no contact with other human beings outside of his cell-mate; had to receive meals from corrections officers; his food rations were unreasonably small; he was deprived of 97% of his personal property; there was no opportunity for him to work, to study, or to attend programs. (AC ¶ 137(c)-(f)).

Most of the restrictions and limitations that plaintiff states he suffered in the

34

Upstate SHU are normal restrictive, and perhaps, harsh, conditions of SHU. Plaintiff refers to these conditions as atypical and significant. However, as stated above, atypical and significant conditions, compared to the ordinary incidents of prison life, may be sufficient to create a liberty interest, but do not establish an Eighth Amendment violation. The fact that plaintiff had to be shackled when leaving his cell, was confined 23 hours per day; had to receive meals from corrections officers, had to wake up at "odd" hours to mail letters or request "necessities," had limited contact with other inmates, was limited in his visitation rights, or did not have an opportunity to attend programs do not rise to the level of a serious deprivation of basic human needs. *See Beckford v. New York State Office of Mental Health*, No. 06-CV-561, 2010 WL 1816689, at *12 (W.D.N.Y. May 3, 2010) (citing, *inter alia, McNatt v. Unit Manager Parker*, No. 3:99CV1397, 2000 WL 307000, at *4 (D.Conn. Jan.18, 2000) (totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to the level of Eighth Amendment violation)*; Shannon v. Selsky*, No. 04 Civ. 1939, 2005 WL 578943, at *6 (S.D.N.Y. Mar. 10, 2005) ("normal" SHU conditions do not violate the Eighth Amendment) (citing *Graham v. Perez*, 121 F. Supp. 2d 317, 322-23 (S.D.N.Y. 2000) (finding no serious deprivation resulting from limiting out-of-cell exercise; deprivation of job opportunity; limiting location and content of meals; denying in-cell hot water and electrical outlets; providing inadequate lighting; limiting

35

recreation; limited "stamp buying opportunities;" limiting access to newspapers; personal telephone calls; and requiring them to wear prison-issue clothing)). Thus, plaintiff's general claims that the conditions in SHU violated the Eighth Amendment may be dismissed.

### 2. Nighttime Cell Illumination

There are some conditions of which plaintiff complains that require further analysis. Plaintiff alleges that the lights in SHU were kept on from 7:00 or 8:00 p.m. until 8:00 a.m. the next morning, causing him to suffer from fatigue and causing his eyes to burn and water. (AC ¶ 114). In *Holmes v. Grant*, No. 03 Civ. 3426, 2006 WL 851753, at *3, 11 (S.D.N.Y. Mar. 31, 2006), the court denied a motion to dismiss on a similar cell illumination issue,[26] brought by defendants pursuant to Fed. R. Civ. P. 12(b)(6), before transferring the case to the Northern District of New York. Plaintiffs in *Holmes* alleged that defendants' 24-hour per day illumination of their cells at Eastern Correctional Facility, caused fatigue, loss of appetite, migraine headaches, and other physical and mental problems. *Id.* The court simply stated that if these allegations were true, the claim would sustain both the objective and the subjective prongs of an Eighth Amendment analysis. After the case was transferred to the Northern District of New York, the parties voluntarily dismissed the action after coming to a settlement agreement. *Holmes v. Corrections Officers*, No. 9:06-CV-462 (LEK/DRH) (Dkt. Nos. 76, 77).

---

[26] There were many other issues in *Holmes* that are not relevant herein. Many of the plaintiff's claims were dismissed prior to transfer.

Other cases have upheld the defendants' maintenance of 24-hour security lighting in prison cells, based upon the facts presented to the court. In a Vermont class action, the district court held that the low wattage security lighting used in Vermont facilities was "of an intensity . . . that courts have generally found permissible under the constitution." *McGee v. Gold*, No. 1:04-CV-335, 2010 WL 5300805, at *5 (D. Vt. August 3, 2010)[27], *Report-Recommendation adopted*, 2010 WL 5389996 (D. Vt. Dec. 20, 2010), *vacated and remanded on other grounds sub nom. Kimber v. Tallon*, No. 11-1430, 2014 WL 715661 (2d Cir. Feb. 26, 2014). Although the district court approved the report-recommendation, the Second Circuit has recently vacated the opinion and remanded the case for further proceedings because the court found that class counsel was inadequate. *Id.* The court made no comment upon the merits of the plaintiffs' claims.

In the cases cited by the Magistrate Judge in *McGee* the court noted that the analysis of this issue was "fact-driven," based upon the degree of illumination, the

---

[27] The court in *McGee* cited *Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (24-hour lighting with a single 9-watt fluorescent bulb does not objectively constitute an "extreme deprivation"); *McBride v. Frank*, No. 05-C-1058, 2009 WL 2591618, at *5 (E. D. Wis. Aug.21, 2009) (constant illumination from a 9–watt fluorescent bulb does not objectively deny "the minimal civilized measure of life's necessities"); *Wills v. Terhune*, 404 F. Supp. 2d 1226, 1230–31 (E. D. Cal. 2005) (holding that 24-hour illumination by 13-watt bulb was not objectively unconstitutional); *Pawelski v. Cooke*, No. 90-C-949-C, 1991 WL 403181, at *4 (W.D. Wis. July 18, 1991) ("Having a single 40 watt light bulb on 24 hours a day for security purposes amounts to no more than an inconvenience to the segregation inmates."), *aff'd*, 972 F.2d 352 (7th Cir.1992) (table); *compare Keenan v, Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996) (lighting from "large fluorescent lights" was unconstitutional where plaintiff alleged that he "had no way of telling night or day"); *Shepherd v. Ault*, , 982 F. Supp. 643, 646-50 (N.D. Iowa) (summary judgment denied where inmates claimed harm from 60–watt bulbs).

discomfort that it caused, and the penological concern for the lighting. *See e.g.*

*Vasquez*, 290 F. App'x at 929 (refusal to turn off the light had a valid penological concern); *Shepherd*, 982 F. Supp. at 645 (finding that constant illumination of a jail cell with bright light, which deprived the inmate of normal sleep, violated the inmate's basic rights) (citing *Zatko v. Rowland*, 835 F. Supp. 1174, 1181 (N.D. Cal. 1993)); *Wills*, 404 F. Supp 2d at 1230-31 (plaintiff admitted that the security light was not even bright enough for him to read or write without straining his eyes).

In this case, defendant Rock states in his declaration that each cell in SHU is equipped with an overhead lighting fixture that houses a day-time overhead light and "a separate 3 watt LED night light." (Rock Decl. ¶ 9). The day-time light may be turned on and off by the inmates in the cell, while the night light is controlled by security staff. (*Id.*) The night lights are kept on between 11:00 p.m. and 6:00 a.m. (*Id.*) Defendant Rock states that the night lights are unobtrusive, but do allow the security staff to see into the cells in order to protect the security of the facility by making sure that inmates are not causing harm to themselves or to their cell mates. (*Id.*) This court notes that a 3-watt LED bulb is much less bright than the 9 or 13-watt illumination that was found acceptable in *Vasquez, McBride*, and *Wills* cited above. Three watts is far from the blinding bright light that plaintiff claims to have endured, causing his burning and watery eyes and rashes.

Defendant Rock has also submitted photographs of an SHU cell, depicting a solid door with a very small window. The low wattage night light helps the officers see into the cell ***without*** disturbing the inmates. The ability to maintain the safety of

the inmates and the officers is a legitimate penological interest. Based upon the very low wattage of the light and the fact that the cell would normally be very dark because of the small window in the door, this court finds that plaintiff cannot meet either prong of the Eighth Amendment analysis.[28] Plaintiff's claim that the lighting in his cell amounted to cruel and unusual punishment may be dismissed.

### 3. Clothing and Temperature

Plaintiff alleges that he was not issued "thermols [sic] upon request for the winter season," and that he was also denied boots, a scarf, and gloves. (AC ¶ 131). He also claims that his cell was "uninsulated." (*Id.*) Plaintiff claims that there is a window and a recreation yard door in each cell, but that neither is insulated, and the cold air comes through, keeping the cell "irregularly cold or freezing." (*Id.* ¶ 132).

---

[28] In any event, even if the court were to find a constitutional violation, defendants would be entitled to qualified immunity from damages on this issue. Plaintiff has finished his sentence in the Upstate SHU, and other than in his "class" claims, he cannot ask for injunctive relief. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990)). Based upon the cases cited above, it is apparent that the low wattage lighting violates no "clearly established" constitutional right of which a reasonable person would have known. The cases are fact-specific, there are many cases finding that all-night lighting does not violate an inmate's Eighth Amendment rights, and the lower and less obtrusive the lighting, the more likely that it will pass constitutional muster. Thus, even if this court were to find a violation, defendants would be entitled to qualified immunity for this claim.

Plaintiff claims that as a result, he suffered from "common colds" and "unreasonable discomfort." (*Id.* ¶ 133). Plaintiff states that he could not take advantage of his recreation time because he was "underdressed," causing an old injury to become stiff, impairing his mobility and causing pain.

Defendant Rock states that every inmate who is admitted to Upstate is issued three shirts; four pairs of pants; three pairs of undershorts/undershirts; three pairs of socks; a pair of sneakers; and a winter coat for outdoor exercise.[29] (Rock Decl. ¶ 13) (citing Rock Decl. Ex. C, SHU Manual at 5) (Dkt. No. 103-23). The manual also states that each cell will be "heated adequately for comfort, as well as lighted adequately to permit reading." (*Id.* ¶ G). Defendant Rock has submitted photographs of the cells, the exercise areas outside of each cell and the visiting areas. (Rock Decl. Exs. A(1), A(2), D(1), D(2)).

The Second Circuit has held that proof that an inmate was subjected "for a prolonged period to bitter cold" will raise a triable issue of fact relative to the objective prong of the constitutional analysis. *Gaston v. Coughlin*, 249 F.3d 156, 164-65 (2d Cir. 2001) (citing *inter alia Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (inmate deliberately exposed to bitter cold in his cell block for three months); *Wright v. McMann*, 387 F.2d 519, 527 (2d Cir. 1967)). However, summary judgment is appropriate when the inmate has not been exposed to bitter cold for "a prolonged period." *Louis-Charles v. Courtwright*, No. 9:11-CV-147, 2014 WL 457951, at *7-8

---

[29] The SHU manual also states that inmates will be issued one sweatshirt in addition to the items mentioned by defendant Rock. (Rock Decl. Ex. C at 5, ¶ D).

(N.D.N.Y. Feb. 4, 2014) (adopting Rep't-Rec.) (sua sponte dismissing claims in which the inmate testified that on three occasions, he was subjected to cold conditions for, at most, ten hours) (citing *Trammell v. Keane*, 338 F.3d 155, 159, 165 (2d Cir. 2003) (plaintiff was deprived of his clothing and confined to his cell for a few weeks, but the temperature was not such as to pose a threat to his health and safety of the sort that would prevent summary judgment in defendants' favor).

The court would point out that plaintiff arrived at Upstate on April 26, 2010 and left upstate on January 20, 2011. (Rock Decl. ¶ 6). Chances are that plaintiff would not have been subjected to the extremely cold temperatures of which he complains during most of that time period. Plaintiff does not contest that he was issued a winter coat and other clothing that he could use to mitigate the effects of any cold temperatures, even if he was denied some of the winter clothing he requested.[30] *See, e.g.*, *Thompson v. Carlsen*, 9:08-CV-965 (FJS/ATB), 2010 WL 3584409, at *10 (N.D.N.Y. Aug. 16, 2010) (Rep't-Rec.), *adopted,* 2010 WL 3584396 (N.D.N.Y. Sept. 7, 2010) ("Even assuming plaintiff's allegations are not exaggerated, he was not subjected to freezing temperatures for prolonged periods, and he was permitted to wear heavy winter clothes to maintain warmth."); *Brown v. McElroy*, 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001) (confining INS detainee in a cold room for a prolonged time

---

[30] During plaintiff's deposition, he testified that he was issued a hat. (Goglia Aff. Ex. E ("DT") at 88. He testified that he suffered dry, cracked lips and an occasional blister on his face. (DT at 91-92). However, he also testified that "some days" you "would feel the heat, actually you could feel the heat coming in and it was "just so cold you could feel the cold as well, . . . it didn't balance out." (DT at 92). The fact that the temperatures "didn't balance out" does not rise to the level of cruel and unusual punishment.

period did not meet the objective criteria for an Eighth Amendment violation because he apparently had clothing and was able to get some warmth with blankets, and provide himself with livable conditions).  Plaintiff's statement that he caught "common colds" and was uncomfortable "regularly" is not sufficient to rise to the level of an Eighth Amendment claim.  His allegation that an old injury stiffened up because he was cold also does not rise to the level of an Eighth Amendment violation, given the short period of time that he was actually in cold weather at Upstate.

Moreover, plaintiff's conclusory claims that one or more of the defendants were acting with deliberate indifference to the inmates' need for warmth is not supported by the record.  The DOCCS staff who worked in the SHU presumably experienced the same temperatures as the inmates.  As noted above, former Upstate Superintendent Rock understood that SHU cells were adequately heated and that inmates were provided with sufficient clothing, including a winter coat, to mitigate the effects of any cold temperatures.  See *Thompson v. Carlsen*, 2010 WL 3584409, at *11.

## VI.  Privacy (Seventh Cause of Action)

Shielding one's unclothed figure from the view of strangers is "impelled by elementary self-respect an personal dignity." *Jean Laurent v. Lawrence*, No. 12 Civ. 1502, 2013 WL 1129813, at *8 (S.D.N.Y. Mar. 19, 2013) (citing *Michenfeler v. Sumner*, 860 F.2d 328, 333-34 (9th Cir. 1988)).  However, while an inmate's right to privacy does not vanish altogether when he is imprisoned, that right must yield to a penal institution's need to maintain security. *Id.* (citing *Cumbey v. Meachum*, 684 F2d 712, 714 (10th Cir. 1982).  In *Jean-Laurent*, the court noted that "'recent cases in this

Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex' – which would include possible glimpses on the way to the shower – 'may be permissible.'" *Id.* (citing *Correction Officers Benev. Ass'n of Rockland Cnty. v. Kralk*, No. 04 Civ. 2199(PG), 2011 WL 1236135, at *11 (S.D.N.Y. Mar. 30, 2011) (citations omitted); *Israel v. City of New York*, No. 11 Civ. 7726(JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012) (finding intake strip searches permissible, notwithstanding the presence of other inmates and officers, males and females); *Baker v. Welch*, No. 03 Civ. 2267(JSR)(AJP), 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) (stating that a balance should be struck, which would allow occasional viewing but that would prohibit regular viewing); *Miles v. Bell*, 621 F. Supp. 51, 67 (D. Conn.1985) (explaining that cases finding a violation of privacy rights have looked to the frequency or regularity of such viewing, and finding violations only in those cases in which the guards "regularly" watch inmates undressing, using toilet facilities, or showering).

Plaintiff alleges that he was forced to conduct his private functions daily "in clear view" of his cell mate (who was of the same sex) and of male and female personnel who might be walking by the cell. (AC ¶¶ 120-24). Defendants have submitted photographs of the cells in SHU. (Rock Decl. Exs. A(1) & A(2)). The pictures show that the cell door is solid with a very small window opening that is on the top half of the door,[31] with the toilet toward the front, left side of the cell. (*Id.* Ex.

---

[31] Defendant Rock states that the window measures 12" by 12". (Rock Decl. ¶ 30).

A(1)). Even with the door open, an individual looking straight through the cell cannot see the toilet. With the door closed, it would be almost impossible to see someone using the toilet unless the guard actually walked up to the door to look inside the cell, and even then, the guard would have to specifically look down to see the toilet. (*Id.*) While it is true that the shower does not have a door or a curtain, defendant Rock states that Muslim inmates are allowed to wear boxer shorts in the shower if they wish to avoid being completely nude. (Rock Decl. ¶ 33).

Plaintiff states in his response to the defendants' summary judgment motion, that any attempt to "shield himself" while housed in Upstate was met with the threat of a misbehavior report, and he cites the defendants' memorandum of law at pp.27-28. However, that section of the defendants' memorandum of law says just the opposite – that "while inmates generally may not obstruct the view into their cells for security reasons, they are permitted to hang a sheet across their cells to obtain privacy while actually showering or using the toilet." (Dkt. No. 103-4 at 28 & Rock Decl. ¶ 31). Additionally, defendants state that the water to the cell showers is only turned on during recreation time, and "any inmate wishing to shower in private may ask his cellmate to go into the adjoining outdoor recreation area." (Rock Decl. ¶ 32). Thus, plaintiff had ready alternatives to protect his right to privacy, and any occasional viewing by members of the same or opposite sex did not rise to the level of a constitutional violation.

## VI. **Religious Rights (Eighth, Ninth, Tenth, and Eleventh Causes of Action)**

### A. **Legal Standards**

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). The right is not extinguished simply because the inmate is in SHU or keeplock. *Id.* (citing *Salahudin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993)). However, the right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04-CV-57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007).

To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold, that the defendants' conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *See Walker v. Artus*, No. 9:10-CV-1431(MAD/DEP), 2013 WL 564909, at *8-9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin*, 467 F.3d at 274-75).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing

a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest.[32] *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord*, 571 F. Supp. 2d at 504-05; *Graham v. Mahmood*, No. 05–10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank*, No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin*, 963 F. Supp. 2d 227, 230 (W.D.N.Y. 1997)).

## B. Application

Plaintiff alleges that his First Amendment right to practice his religion was violated because he was not able to attend religious services, study groups, or engage in fithea (hair removal). (AC ¶ 139). Plaintiff claims that there is no substitute for his weekly Juma services, he was not afforded any access to the Imam, and he was forced to view his cell-mate's nudity, as well as appear nude before his cell-mate, both of which are forbidden by plaintiff's religion. (AC ¶¶ 142-47). Plaintiff claims that his celebration of Ramadan was disrupted because he was denied access to the

---

[32] However, RLIUPA does not provide for damages against defendants in their official capacities, and although the Second Circuit has not spoken on the issue, numerous district courts have held that RLIUPA does not provide for damages in the defendant's individual capacity. *See Jean Laurent v. Lawrence*, No. 12 Civ. 1502, 2013 WL 1129813, at *7 n.9 (S.D.N.Y. Mar. 19, 2013) (citing cases).

appropriate food, and defendants Taylor, Rakoce, and Dumas denied plaintiff his entire Eid ul Fitr meal on September 18, 2010. (AC ¶ 153-55). On September 17, 2010, defendant Taylor and Dumas did not give plaintiff the proper food because they were not responsible for "NOI"[33] food. (AC ¶¶ 157-58).

With respect to the issue of nudity, the court has discussed the constitutional "privacy" issue in the section above. With respect to the religious implications, the court assumes that the practice burdens the inmate's religious beliefs, however, there are valid penological objectives for prohibiting complete shielding of inmates at all times or for allowing the occasional viewing of male inmates in various states of undress by female officers. Defendants' accommodation involves allowing Muslim inmates to wear boxer shorts or a towel around their waists in the shower, allowing a brief shielding of the cell during the time that the water is turned on for showers, or allowing inmates to ask their cell mates to step out into the recreation pen while the inmate showers or uses the toilet.[34] The court finds that these alternatives are reasonable and finds that the defendants' policy serves a legitimate penological objective. Even if the court were considering the RLUIPA standard, the defendants'

---

[33] "NOI" stands for Nation of Islam, a Muslim sect that is different from Shia or Sunni Muslims.

[34] Defendant Rock states that each cell at Upstate has a door accessing its own exercise area, and that the inmates are given more than the one hour minimum required exercise time per day. In fact the outdoor exercise areas are unlocked "for at least two hours per day pursuant to the SHU manual, and at least half an hour additional time is afforded to inmates who have displayed good behavior and have advanced to "PMS Level III status." (Rock Decl. ¶ 25). PIMS stands for Progressive Inmate Movement System. (*Id.*) There are three different levels of PIMS status for inmates who maintain good behavior while incarcerated at Upstate. Level III affords the most desirable conditions and extent of privileges. (*Id.* & n.1).

alternatives are the least restrictive measure, given the increased security issues in SHU.

Inmates in SHU are not allowed to attend congregate services pursuant to Directive 4933; 7 N.Y.C.R.R. § 304.9(d); and SHU Manual at 45. (Rock Decl. ¶ 35). However, these inmates may obtain religious counseling by making a written request to the facility's ministerial staff. (*Id.*) Each SHU inmate is also allowed to have a Qu'ran, a prayer rug, and similar "devotional articles" in his SHU cell. DOCCS Directive No. 4933; 7 N.Y.C.R.R. § 302.3(e)(2); and SHU Manual at 7. Defendant Rock states that an Imam visits Upstate monthly, or whenever an Islamic inmate requests a visit or religious counseling. (Rock Decl. ¶ 36).

In *Walker v. Artus*, the court held that notwithstanding the regulations prohibiting SHU inmates from attending congregate services, DOCCS provides "several accommodations" to Muslim inmates in SHU so that they may practice their religion. *Walker v. Artus*, No. 9:10-CV-1431, 2014 WL 675815, at *18 (N.D.N.Y. Sept. 27, 2013) (Rep't-Rec.), *adopted*, 2014 WL 675815, at *6-10 (N.D.N.Y. Feb. 21, 2014).[35] The accommodations cited in *Walker* are the same as cited by defendants in this action. Plaintiff in *Walker* had requested that, in addition to the other accommodations, he be allowed to watch the congregate services by video or to listen to a tape recording. The court denied plaintiff's claim, and based its decision both on

---

[35] The court notes that the Westlaw citation for this decision does not differentiate between the date of the report-recommendation and the date of the district court's adoption. Both decisions are printed together on Westlaw. In this citation, I have indicated the date of the report-recommendation from this court's docket sheet.

48

the First Amendment and RLUIPA, finding that neither was violated.

Defendant Rock states that SHU inmates are not allowed to attend congregate services based upon the risk they pose to institutional security. (Rock Decl. ¶ 37). Defendant Rock states that because of plaintiff's known gang affiliation and his disciplinary history, he is viewed as an increased security risk in addition to being in SHU, and states that releasing plaintiff from confinement to attend congregate services "clearly would have posed a threat to the safety of other prisoners and to the security of Upstate CF." (*Id.*)

Plaintiff alleges that an Imam did not visit the SHU while he was there. (AC ¶ 143). However, defendant Rock notes that, even if an Imam had not been available at Upstate, DOCCS Directive 4202 expressly provides that an inmate may encourage outside clergy to contact the coordinating chaplain and apply to become a "registered religious volunteer." (Rock Decl. ¶ 38 & Ex. E (copy of Directive 4202)). The plaintiff in *Walker* also alleged that the Imam did not visit the SHU regularly. In adopting Magistrate Judge Peebles's recommendation, District Judge D'Agostino found that even assuming that the religious leader did not visit as often as required, "that would not change the fact that Plaintiff received numerous other accommodations to practice his religion . . . ." 2014 WL 675815, at *8.

Plaintiff alleges that he was unable to perform his religious hair removal. (AC ¶ 139). There is no indication that plaintiff was not allowed to shave while he was in SHU. Defendant Rock states in his declaration that SHU inmates may obtain shaving cream and razors daily before each scheduled exercise period. (Rock Decl. ¶ 43).

49

Plaintiff has not indicated why he may not use the issued razors for shaving purposes, and defendant Rock states that other Muslim prisoners "routinely do this." (*Id.*)

Finally, plaintiff alleges that defendants Rakoce, Taylor, and Dumas denied plaintiff his Suhoor Bag[36] during Ramadan on September 17, 2010 and his Eid ul Fitr meal on September 18, 2010. (AC ¶¶ 155-57). Plaintiff alleges that defendant Taylor was giving out the Suhoor bags, but told plaintiff that Taylor only served Shia Muslims, but no "second" officer came by with plaintiff's Suhoor bag. (AC ¶ 157). Plaintiff went without breakfast that day, and he states that when defendant Dumas came by to serve the evening feast, he told plaintiff that he did not have plaintiff's meal because Dumas was "doing only orthodox sunni meals." (*Id.*) Once again, he went without a meal, and the area Sergeant never came along to "rectify the matter."

These are the only claims that plaintiff makes against defendants Rakoce, Taylor, and Dumas. Plaintiff does not allege that these individuals intentionally denied him his religious meals. Even according to plaintiff's version of the events, it appears as though these defendants delivered the religious meals for other Muslims, but somehow plaintiff was left out. Defendant Rock states that plaintiff was on the list of Muslim inmates who were participating in the 2010 Ramadan fast, and states that to defendant Rock's knowledge, plaintiff was always given his appropriate meals. (Rock Decl. ¶¶ 39-40). Exhibit F to defendant Rock's declaration shows that plaintiff was on the list of inmates participating in the Ramadan fast. (Rock Aff. Ex. F at 2) (Dkt. No.

---

[36] The Suhoor bag contains an early morning religious meal, eaten during Ramadan before fasting.

103-28). Exhibit F also contains a memorandum from Sergeant Rakoce to FSA D. Haug, stating that defendant Rakoce was the Block Sergeant on September 18, 2010, and that plaintiff never complained to him or advise him that he did not receive his lunch meal.[37] (Rock Aff. Ex. F at 2).

At worst, the amended complaint indicates that defendants Taylor and Dumas made a mistake, thinking that they were serving meals only for other Muslim sects or that someone who was supposed to serve plaintiff's meal did not come afterward. Mistakes, even those amounting to negligence, are not actionable under the First Amendment. *Daniels v. Williams*, 474 U.S. 327, 331-33 (1986) (injuries inflicted by governmental negligence are not addressed by the U.S. Constitution); *Scott v. Shansiddeen*, No. 9:12-CV-84, 2013 WL 3187071, at *4 (N.D.N.Y. May 28, 2013) (Rep't-Rec), *adopted*, 2013 WL 3187071, at *1 (N.D.N.Y. June 20, 2013) (citing *Tafari v. Brown*, No. 9:10-CV-1065, 2012 WL 1098447, at *6 (N.D.N.Y. Mar. 30, 2012); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 498 (N.D.N.Y. 2009)). In *Shansiddeen*, the court dismissed a First Amendment claim by a plaintiff who missed only two religious meals, in part because plaintiff's claims sounded in negligence, alleging that the defendant failed to catch a mistake made by a clerk regarding the plaintiff's location for delivery of the religious meals, and in part because missing two

---

[37] This memorandum is apparently the investigation of plaintiff's internal grievance, complaining that he did not receive his lunch on September 18, 2010. (Rock Decl. ¶ 42). The court also notes that defendant Rock indicates that there is an Exhibit G, which is the Ramadan Menu for 2010. (Rock Decl. ¶ 40). There is no Exhibit G filed, however, the court does not doubt that there was a Ramadan Menu since plaintiff alleges that other inmates got their food. Thus, the absence of that exhibit is not relevant to the court's findings.

meals did not "substantially burden" plaintiff's ability to freely exercise his religion.

The same is true in this case. Any mistakes made by defendants did not violate plaintiff's constitutional rights, and as defendant Rock states, as the Superintendent, he is not responsible for serving food to inmates. Defendant Rakoce's memorandum shows that plaintiff was on the list and should have been served his religious meals. If a mistake were made, and plaintiff missed his meals, defendant Rock would have no way of "rectifying" the situation.

Thus, this court finds that plaintiff's religious claims may be dismissed.

## VII. Conspiracy

### A. Legal Standards

In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement . . .; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002); *Cusamano v. Sobek*, 604 F. Supp. 2d at 468. An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action are insufficient. *See Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999). Thus, plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy

claim.  *Ciambriello*, 292 F.3d at 325.

## B.    Application

In this case, because the court has found no constitutional violations, any claim that plaintiff has based upon a "conspiracy" by defendants must fail.  First, plaintiff's conspiracy claims all appear to be related to his "class action."  To the extent that he claims that anyone conspired to violate his individual constitutional rights, plaintiff has not set forth anything but conclusory allegations that the defendants participated in such a conspiracy.[38]  The disciplinary hearing that placed plaintiff into SHU was at one facility, while the "conditions of confinement" that plaintiff claims were unconstitutional were at another facility.  There is no indication that the defendants somehow "agreed" on any constitutional or other violations.  Even if plaintiff had made a proper vagueness challenge, none of the individuals at Shawangunk would have participated in any conspiracy since they had nothing to do with the charges or the hearing that placed plaintiff in SHU.

Plaintiff sets forth various conclusory statements about a conspiracy to charge African-American and Latino inmates with gang-related violations in order to force them to participate in the ART program.  Plaintiff claims that this is a violation of his First and Fourteenth Amendment rights.  He claims that in the ART program inmates are "forced" to admit that their "ethnical [sic]" culture is "unauthorized gang, violent, [and] un-american [sic]."  (AC ¶ 36).  Plaintiff has absolutely no basis for this

---

[38] The court notes that with respect to defendant Counselor Cook, it is the only claim in which he has been named.

statement, and as the court has found above, ethnicity is not relevant to the rule prohibiting gangs and gang-related materials. Plaintiff does not claim any other due process violations regarding his placement in the ART program.[39] Thus, any conspiracy claim would have to have been dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 103) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS**, and it is

**RECOMMENDED**, that plaintiff's motion for summary judgment (Dkt. No. 69) be **DENIED**, and it is

**RECOMMENDED**, that plaintiff's motion for sanctions (Dkt. No. 107) be **DENIED**, and it is

**RECOMMENDED**, that defendants' cross-motion for sanctions (Dkt. No. 108) be **DENIED**, and it is

**ORDERED**, that plaintiff's motion for appointment of counsel (Dkt. No. 109) is **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.

---

[39] The court has already rejected plaintiff's claims that inmates' placement in ART is somehow related to an effort by DOCCS to obtain federal funding and to keep SHU facilities open by falsely charging inmates with misbehavior. In fact, during plaintiff's deposition in this case on January 8, 2013, he testified that he still had not re-taken the ART program because Upstate did not offer the program. (DT at 61).

Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 6, 2014

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**